
CLERK'S OFFICE
A TRUE COPY
Apr 02, 2025
/s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

❒ Original          ❒ Duplicate

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| The person and cellular phone of MAJIDAH MURRAR (DOB: XX/XX/1991), as more fully described in Attachment A. | ) ) ) ) |

Case No. 25-M-340 (SCD)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Eastern _____ District of _____ Wisconsin _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before ___ 4-16-25 ___ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.     ❒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ___ Honorable Stephen C. Dries ___.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial) and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for _____ days *(not to exceed 30)*     ❒ until, the facts justifying, the later specific date of _____ .

Date and time issued:  ___ 4-2-25 1:45 pm ___

*Stephen C. Dries*
*Judge's signature*

City and state:  ___ Milwaukee, WI ___     Honorable Stephen C. Dries
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### *Person and Property to be Searched*

1.      The person of Majidah MURRAR (A/F, DOB: 02/07/1991).

2.      MURRAR's cellphone bearing phone number (414) 758-0734.

## <u>ATTACHMENT B</u>

### *Particular Things to be Seized*

1.      The cellphone, including records and information stored on the **Device,** described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1), 843(a)(2) (to use in the course of the manufacture, distribution, or dispensing of a controlled substance, or to use for the purpose of acquiring or obtaining a controlled substance, a registration number which is fictitious, revoked, suspended, expired, or issued to another person), and 843(a)(3) (to acquire possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge) involving Majidah MURRAR since July 1, 2023, including:

  a.  Any audio, video, and/or photograph(s) files on the phone of the above criminal activity or of evidentiary value;

  b.  Records of communications, including voicemail, call records, call history, or text messages in any format regarding prescribing, providing, selling, distributing, or otherwise obtaining controlled substances;

  c.  Contact list, to include names, addresses, phone numbers, and/or email addresses;

  d.  All social media sites used and applications for social media sites;

  e.  All applications used to store patient care data, health records, or prescription records;

  f.  All applications used to manage, prescribe, issue, or track prescriptions of controlled substances;

  g.  Evidence of health, or patient, care provided by Majidah MURRAR;

  h.  Types, amounts, and prices of controlled substance transactions as well as dates, places, and amounts of specific transactions;

       i.   Any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

       j.   All bank records, checks, credit card bills, account information, and other financial records;

      k.   Evidence of compensation, gifts and/or favors exchanged between other individuals and Majidah MURRAR;

       l.   All internet activity; and

      m.  All location data including from the phone and/or from any downloaded applications.

2.     Evidence of user attribution showing who used or owned the **Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history; and

3.     Records evidencing the use of the Internet Protocol address to communicate with using the internet including:

      a.   records of Internet Protocol addresses used; and

      b.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data), any photographic form, and/or any memory card or other data storage device within or connected to the **Device**.

During the execution of the search described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of Majidah MURRAR to the

fingerprint scanner of the device; and/or (2) hold a device found in front of the face of Majidah MURRAR and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.



CLERK'S OFFICE
A TRUE COPY
Apr 02, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No. 25-M-340 (SCD) |
| The person and cellular phone of MAJIDAH MURRAR (DOB: XX/XX/1991), as more fully described in Attachment A. | ) ) ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21, U.S.C. Sections 841(a)(1), 843(a)(2), and 843(a)(3) | Distribution and Possession with Intent to Distribute a Controlled Substance; use a registration number issued to another person for acquiring or dispensing a controlled substance, acquire substance by fraud |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

JARROD MAGUIRE  Digitally signed by JARROD MAGUIRE
Date: 2025.04.02 08:00:29 -05'00'

_____
*Applicant's signature*

Jarrod Maguire, Special Agent - DEA
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: _4-2-25_

_____
*Judge's signature*

City and state: Milwaukee, WI

Stephen C. Dries, U.S. Magistrate Judge
_____
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Amber Giese, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND INVESTIGATOR BACKGROUND**

1.      I make this affidavit in support of an application under Federal Rule of Criminal Procedure 41 for a search warrant authorizing the search of a device and the extraction of evidence from that device of electronically stored information as described in Attachment B.

2.      I am a Diversion Investigator with the Drug Enforcement Administration ("DEA"). I have been so employed since July 2014 and am currently assigned to the DEA Milwaukee District Office.  As part of my duties as a DEA Diversion Investigator, I investigate criminal violations involving Title 21, United States Code, and Title 21, Code of Federal Regulations, Part 1300 et seq. In my capacity as a Diversion Investigator, I have conducted and participated in investigations of practitioners, pharmacies and individuals involved in diversion, that is, the unlawful distribution and acquisition of pharmaceutical controlled substances. I am familiar with the usual methods of investigation, including but not limited to, conducting audits, the questioning of witnesses, the use of informants, undercover operations and the review of social media platforms and phone records for communication.

3.      I have participated in complex investigations which involved violations of state and federal controlled substances laws including Title 21, United States Code, Sections 841(a)(1), 843(a)(2), and 843(a)(3).

4.      The facts in this affidavit come from my personal observations; my training and experience; information obtained from other agents, law enforcement officers, and witnesses; DEA records, public records (open source); and records and information received from other parties, such as the Wisconsin Department of Safety and Professional Services (DSPS) and

telecommunication companies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.       Based on the facts set forth in this affidavit, there is probable cause to believe that Advanced Practice Nurse Prescriber (APNP) Majidah K. MURRAR was involved in the unlawful distribution of controlled substances outside the scope of normal medical practice and not for a legitimate medical purpose, in violation of Title 21, United States Code, Sections 841(a)(1), 843(a)(2), (to use in the course of the manufacture, distribution, or dispensing of a controlled substance, or to use for the purpose of acquiring or obtaining a controlled substance, a registration number which is fictitious, revoked, suspended, expired, or issued to another person) and 843(a)(3) (to acquire possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge) and that evidence of this crime can be found in the Device as described in Attachment A. The particular evidence to be seized from the Device is described in Attachment B.

## PERSON AND PROPERTY TO BE SEARCHED

6.       The person of Majidah MURRAR (DOB: 02/07/1991).

7.       The property to be searched is the cellphone belonging to Majidah MURRAR bearing the phone number of (414) 758-7034 (the "Device"). The Device is currently in the possession of MURRAR.

8.       The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9.       I am conducting an investigation of Majidah MURRAR ("MURRAR"), for her suspected involvement in the unlawful distribution of controlled substances outside the scope of

2

normal medical practice and not for legitimate medical purposes, in violation of Title 21, United States Code, Section 841(a)(1); using in the course of dispensing of a controlled substance a registration number with was issued to another person, in violation of 21 U.S.C. §843(a)(2); and acquiring possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge, in violation of 21 U.S.C. §843(a)(3).

10.     MURRAR is a Mid-Level Practitioner (an Advanced Practice Nurse Prescriber or "APNP", also commonly referred to as a Nurse Practitioner or "NP") licensed to practice medicine in the state of Wisconsin. MURRAR maintains DEA Registration Number MK4941870, registered at 1301 College Avenue, Unit 6G, South Milwaukee, WI, 53172, which authorizes MURRAR to issue Schedules II-V controlled substance prescriptions in Wisconsin. MURRAR's contact phone number on file with MURRAR's DEA registration is cellphone number (414)-758-7034. Investigation in this case has revealed the aforementioned address was MURRAR's former home address.

11.     I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation and my review of: (a) records pertaining to DEA Registration MK4941870 (b) Wisconsin Prescription Drug Monitoring Program ("PDMP") records (c) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; (d) information obtained from telecommunication companies and pharmacies, and (e) information from the Wisconsin Department of Safety and Professional Services (DSPS).

12.     Pursuant to Title 21, United States Code, Section 841(a)(1) and Title 21, Code of Federal Regulations, Section 1306.04(a), the distribution of controlled substances is unlawful unless the controlled substances are issued for a legitimate medical purpose by an individual

3

practitioner acting in the usual course of his or her professional practice. The practitioner is responsible for the proper prescribing and dispensing of controlled substances. Based on information received from other law enforcement and regulatory agencies, telecommunication companies, prescribing databases, and prescription images, there is probable cause to believe that MURRAR has issued controlled substance prescriptions outside of the usual course of professional practice, and that MURRAR issued controlled substance prescriptions to at least one individual (M.B., DOB XX/XX/1984) with an agreement that MURRAR would receive a portion of the controlled substances back from M.B. once the prescription was filled at the pharmacy or cash for the prescription in violation of 21 U.S.C. §843(a)(3). Additionally, there is also probable cause to believe that, in at least one instance, MURRAR has issued controlled substance prescriptions using a DEA registration number that was issued to another practitioner (Dr. Chukwuma Edward UGWU) in violation of 21 U.S.C. §843(a)(2).

***Background***

13.    MURRAR became registered with the DEA in September 2018 under her married name Majidah KATTAN. MURRAR changed the name on her DEA registration to Majidah MURRAR in July 2022. A review of public records shows that MURRAR filed for divorce from Omar Kattan in April 2019 and their divorce was finalized in approximately October 2021.

14.    MURRAR maintained Wisconsin Registered Nurse License Number 198775-30 (granted April 14, 2014) and Advanced Practice Nurse Practitioner License Number 8685-33 (granted September 4, 2018). Both licenses were both suspended as of January 13, 2025, pursuant to an Order of Summary Suspension issued by the Wisconsin Board of Nursing (DLSC Case No. 24 Nur 0157).  MURRAR's Advanced Practice Nurse Prescriber license listed a specialty in "Nurse Practitioner".

4

15.     Investigation shows that MURRAR currently resides at 9566 S. Broadacre Lane, Unit #9, Oak Creek, WI 53154.  Additionally, investigation shows that MURRAR is currently co-owner of the following vehicle: Mercedes Benz GLC Sportutility, White, 2019, Vehicle ID Number WDC0G4KB6KF490052, bearing the license plate AXP7173. MURRAR co-owns this vehicle with J.P. (DOB XX-XX-1991) who resides at 3026 N 29th Street, Milwaukee, WI 53210.

16.     Investigation shows no current employment for MURRAR since March 2023.

17.     Prior to March 2023, MURRAR was employed at Emergency Medical Specialists, SC, 10625 W North Avenue, Suite 102, Milwaukee, WI 53226.

***Complaint Information***

18.     In December 2024, DEA received information from the Wisconsin Department of Safety and Professional Services ("DSPS").  The DSPS stated that MURRAR's Wisconsin nursing licenses were under investigation and review for possible suspension due to allegations that MURRAR sold controlled substance prescriptions for Adderall to M.B.

19.     In January 2025, DEA received a copy of an Order of Summary Suspension (DLSC Case No.24, NUR 0157), dated January 13, 2025, for MURRAR. The Wisconsin Board of Nursing ("Board") immediately suspended MURRAR's nursing license based on the following findings of fact, in part: (1) "On February 16, 2024, the Division received a complaint from the Mayville Police Department (MPD) alleging that [MURRAR] was selling or otherwise illegally providing prescription medications to [M.B.] (a male born in 1984) between January 2023 and January 2024. MPD also provided a report dated February 27, 2024, in support of the complaint; (2) On February 9, 2024, an MPD officer spoke with [M.B.] who reported that [MURRAR] had illegally written Adderall prescriptions for him in exchange for cash or Adderall pills; (3) The MPD officer reviewed [M.B.]'s cell phone as part of MPD's investigation; (4)  From [M.B.]'s cell phone, MPD

5

obtained approximately 200 screen shots of text messages between [M.B.] and [MURRAR], dated between August 2023 and January 2024. The text messages sent to [M.B.] by [MURRAR] were from telephone number 414-758-7034, which matches [MURRAR]'s telephone number on file with the Department; (5) The text messages between [M.B.] and [MURRAR] discussed, among other things, the exchange of Adderall prescriptions written by [MURARR] for money or pills. [MURRAR] also expressed concern on several occasions about losing her license because of this arrangement; and (6) The text messages between [M.B.] and [MURRAR] also reflect communications that were extremely personal and intimate in nature and at times sexually explicit."

20.     After receiving a copy of MURRAR's summary suspension order, I obtained a copy of the aforementioned "MPD" (Mayville Police Department) report and spoke with the Mayville PD detective regarding M.B. On February 9, 2024, M.B. was arrested outside of his residence pursuant to a warrant issued due to a probation and parole violation. M.B. was on probation at the time of his arrest in part due to a conviction of possession of controlled substances on December 6, 2023; M.B. was sentenced to 18 months of probation. At the time of his arrest, M.B. had a cellphone on his person. M.B. was interviewed and provided Mayville PD with consent to search his cellphone and provided the cellphone passcode (aka "PIN") for entry. Mayville PD took photos of text messages between M.B. and MURRAR. Additionally, a search of M.B.'s garage was conducted at the time of his arrest and detectives discovered evidence of drugs (identified as fentanyl) and drug paraphernalia.

21.     In February 2025, I also obtained a sample of the photos of the text messages between M.B. and MURRAR referenced in MURRAR's summary suspension order. The phone number listed in M.B.'s cellphone for "Mattress Lady" is the same contact phone number listed

6

for MURRAR's DEA Registration MK4941870. The text messages between MURRAR and M.B. discuss payments for prescriptions, pharmacies where M.B. should go to pick up prescriptions, using coupons to get the prescriptions at a discount, among other things. MURRAR and M.B. repeatedly refer to the Adderall as "Addys".

22. Additionally, I obtained a copy of M.B.'s Prescription Drug Monitoring Program ("PDMP") data. According to the PDMP for M.B., MURRAR issued three (3) prescriptions for amphetamine-dextroamphetamine (Adderall) 30mg tablets and one (1) prescription for hydrocodone with acetaminophen 5mg-325mg tablets between September 2023 and November 2023.

23. In February 2025, I received intelligence from the Mayville PD regarding M.B.'s criminal history. I also utilized law enforcement databases to obtain M.B.'s criminal history. The review of Mayville PD records and law enforcement databases revealed that M.B. was found guilty of possession of a controlled substance in December 2023 and June 2024. M.B. was also found guilty on two counts of possession of drug paraphernalia and misdemeanor bail-jumping June 2024. Prior to this, M.B. was found guilty of two counts of disorderly conduct in 2014.

24. In January 2025, I received intelligence from the City of Brookfield Police Department ("PD") regarding MURRAR's criminal history. In February 2025, I also utilized law enforcement databases to obtain MURRAR's criminal history for both names Majidah MURRAR and Majidah KATTAN. The review of City of Brookfield PD records and law enforcement databases revealed that MURRAR was charged in Waukesha County in August 2022 (Case No. 2022-CF-001298) with five (5) felony counts of Wisconsin Statute 943.201(2)(a), misappropriate ID info to obtain money. In February 2024, MURRAR was also charged with felony bail jumping (Wis. Stat. §946.49(1)(b)) in relation to the aforementioned August 2022 charges. A warrant was

7

issued for MURRAR. MURRAR was subsequently arrested and appeared in court on March 5, 2025. This case is on-going and currently scheduled for hearing on April 2, 2025.

25. After receiving a copy of MURRAR's summary suspension order, I also obtained copies of email communications between MURRAR and the Wisconsin DSPS. On January 14, 2025, after MURRAR's nursing licenses were suspended, MURRAR provided information regarding her treatment of M.B. MURRAR denied ever taking money or anything else from M.B. and accused M.B. of drug seeking. MURRAR stated, in part, "I only treated his infection and he requested that I refill his existing medication. This was an attempt made by me to bridge his care while he was between primary care doctors. I did not bill his insurance, take compensation for my evaluations, medication refills, or referrals to specialist care. Attached is a screen shot of the other medications I prescribed to him for his cellulitis and critical infection…" Included with MURRAR's email were screenshots of what purported to be M.B.'s patient record. These screenshots appeared to be digital images that captured the current display on a mobile device screen. These screenshots (four total) contain M.B.'s "patient information" and a status bar indicative of being taken on a mobile phone. The time stamp, WiFi signal strength, network/internet connection, and battery level all appear on the status bar at the top of each screen shot. The screenshots indicated that they were taken at 7:40, 7:41, and 7:42 and appear to be of an application used to hold and manage patient information.

26. I know, based on my training and experience, that practitioners such as doctors and nurses, utilize cellphones and cellphone applications to store patient information and send electronic prescriptions. Practitioners are authorized per 21 CFR Part 1311 to use electronic means for the purpose of transmitting prescriptions if the electronic prescription application that meets

8

all of the applicable requirements of 21 CFR §1311, Subpart C. There is probable cause that the screenshots MURRAR sent to DSPS in January 2025 were taken on the Device.

***Information Obtained from PDMP Database***

27.     As part of my investigation, I reviewed data contained within the Prescription Drug Monitoring Program, commonly referred to as "PDMP" (see Wis. Stat. §450.19). As a Diversion Investigator, I use the PDMP to review prescriptions of controlled substances issued and dispensed by DEA registrants and filled by individual persons of interest. The Pharmacy Examining Board ("PEB") governs the PDMP, and the Wisconsin Department of Safety and Professional Services ("DSPS") oversees the operation of the PDMP in accordance with the policies established by the PEB.

28.     A review of MURRAR's PDMP records revealed that MURRAR listed a prescriber address of 2301 N Lake Drive, Milwaukee, WI, 53226 as MURRAR's "Primary Practice Address" in the National Provider Identifier ("NPI") Registry. Investigation shows that this address is for Ascension Columbia St. Mary's Hospital - Milwaukee Campus (hereinafter "Ascension"). According to Ascension's website, https://healthcare.ascension.org, this Ascension hospital provides "specialty and 24/7 emergency care". However, Ascension has stated that MURRAR has never worked at the aforementioned address.

29.     A review of MURRAR's PDMP records also revealed the majority (approximately 54%) of the controlled substances she issued were opioids, mainly for forms of Schedule II oxycodone HCl (approximately 40%), followed by stimulants (23%), which were all forms of Schedule II amphetamine-dextroamphetamine. Additionally, MURRAR also issued prescriptions for promethazine with codeine, a Schedule V opioid controlled substance, which the PDMP classifies under the drug type "other". Promethazine with codeine prescriptions made up

9

approximately 19% of all of MURRAR's controlled substance prescribing between March 2019 and March 2025.

30.     PDMP records also show that MURRAR continues to issue controlled substance prescriptions (approximately 46) for mostly (approximately 96%) amphetamine-dextroamphetamines, promethazine with codeine, and oxycodone to 27 different individuals since the suspension of MURRAR's Wisconsin state nursing licenses on January 13, 2025. These prescriptions were dispensed at nine (9) different Wisconsin pharmacies. Upon the suspension of her license, MURRAR was made aware that her Wisconsin state nursing licenses are suspended, and she has been in communication with the WI DSPS since the suspensions.

31.     I reviewed recent telecommunication records for MURRAR and MURRAR's phone bearing the number 414-758-7034, which shows that MURRAR has been in contact (either incoming or outgoing), specifically voice and text communications, with six of the aforementioned nine pharmacies approximately 30 times since the suspension of MURRAR's Wisconsin nursing licenses in January 2025.

32.     PDMP records also show that MURRAR regularly receives prescriptions for various strengths and forms of amphetamine-dextroamphetamine, a Schedule II stimulant. Between 2019 and March 2025, MURRAR received approximately 91 prescriptions for amphetamine-dextroamphetamine and 2 prescriptions for a similar drug, lisdexamfetamine dimesylate. The other four prescriptions issued to MURRAR during this time-period were for Schedule IV controlled substances lorazepam (a benzodiazepine), tramadol (an opioid), and phentermine (a stimulant). These prescriptions were issued by a total of 12 different providers with approximately half of the prescriptions (50.0%) being issued by the same provider. Additionally,

10

five (5) prescriptions were issued by Chukwuma Edward UGWU, MD ("Dr. UGWU") between August 2019 to October 2019.

33. Additionally, MURRAR's earlier PDMP records show indicators for early refills (that is the filling of a new prescription before the previous prescription medications were scheduled to run out). A majority of MURRAR's prescriptions (approximately 86.5%) were issued for a 30-day supply, which is generally intended for use on a monthly basis. However, PDMP records between 2019-2021 also show that MURRAR received additional prescriptions during some months. For example, in March 2019, July 2019, September 2019, and October 2019 MURRAR received two prescriptions each month for a thirty-day supply of amphetamine-dextroamphetamine. Quantities for these prescriptions ranged from 60 to 90 tablets per prescription and were issued by three different providers. A similar pattern continues for 2020 and 2021. Repeated requests for early refills is considered a "red flag" and may be indicative of a medication being misused or diverted.

34. Wisconsin's administrative code (see Wis. Admin. Code § CSB 4.105) requires a practitioner, or a practitioner's delegate assisting the practitioner in accordance with the standards of practice for the practitioner's profession, to review the monitored prescription drug history report [PDMP] about a patient before the practitioner issues a prescription order for the patient unless the instance meets certain conditions or exemptions (e.g. hospice care, emergencies, etc.). Practitioners that fail to adhere to this statute is subject to licensing or regulatory discipline by the appropriate board.

35. I obtained and conducted a review of PDMP records for MURRAR's prescriber history checks referred to as a "Prescriber Query History Report". These records show that MURRAR did not conduct the required PMDP checks prior to each instance of controlled

11

substance prescriptions as required by Wisconsin statutes. These records also show that MURRAR repeatedly checked her personal PDMP profile between February 2019 and March 2024. Additionally, the records show that MURRAR has not checked the PDMP since the suspension of MURRAR's Wisconsin nursing licenses on January 13, 2025, even though she has continued to prescribe controlled substances.

### *Additional information obtained from DSPS*

36.　　In February 2025, I obtained information from the Wisconsin Department of Safety and Professional Services (DSPS) regarding a complaint from anonymous source submitted via DSPS's online website (www.dhs.wisconsin.gov). The complainant (who appears to be a male) alleged that MURRAR obtained his trust and began pressuring him to take Adderall (a Schedule II controlled substance) despite his refusals or disclosures of past struggles with addiction. MURRAR repeatedly insisted he needed it. After MURRAR prescribed him Adderall, MURRAR claimed that she had overprescribed the Adderall and requested half of the pills back so MURRAR could safely dispose of them. This pattern continued for several months until he became suspicious and he confronted MURRAR.　After this MURRAR then wrote him a prescription and then personally dropped the prescription off to the pharmacy herself. MURRAR asked him to pay her for it, reassuring him that it was completely legal. According to the complainant, "When I picked up the prescription and met her to give her the money, she seemed irritated and said she needed [the] Adderall instead." He claimed to have recorded the interaction and spoken to a pharmacy technician about the incident, but became too nervous to report MURRAR to the DSPS due to her continuous threats. He did not state if he gave MURRAR the money or the Adderall. He also claimed that MURRAR asked him to help her sell Ozempic on Facebook. (Ozempic is a non-controlled medication intended for use to treat diabetes and currently gaining popularity for use as

a weight-loss drug). He also claimed that MURRAR threatened to kill him. The complainant claims to "know for a fact that she has done this multiple times with others in exchange for pills, money, or sex". However, the complainant requested to remain anonymous and, to date, remains unresponsive to email requests for additional information. Neither DSPS nor I have been able to confirm the allegations of this particular complaint.

37.     In March 2025, I obtained information from the Wisconsin Department of Safety and Professional Services (DSPS) regarding a complaint by CVS Pharmacy #8767 in Milwaukee, Wisconsin and W.J.K. (DOB XX/XX/1981; Phone Number XXX-XXX-8872). CVS Pharmacy #8767 was in possession of a prescription issued by MURRAR to W.J.K. on March 20, 2025, for oxycodone IR 15mg tablets, quantity 60. The pharmacist could not identify a valid place of employment for MURRAR.

38.     I reviewed recent telecommunication records for MURRAR and MURRAR's phone bearing the number 414-758-7034, which shows that MURRAR has been in contact with W.J.K. 229 times between December 2, 2024, and March 24, 2025, including nine (9) times on the day the prescription was issued (March 20, 2025). Communications consist of incoming (to MURRAR) and outgoing (from MURRAR) voice and text as well as outgoing data and multimedia messaging services (MMS) used for pictures, videos, and audio.

***Information obtained from Local Law Enforcement***

39.     As part of my investigation, I also obtained information from the Oak Creek Police Department (PD). On February 28, 2025/March 1, 2025, the Oak Creek PD responded to a call from MURRAR at her home (9566 S. Broadacre Lane, Apt #109, Oak Creek, Wisconsin). MURRAR told the officer that her boyfriend, A.A. (DOB XX/XX/1992) broke into her apartment and choked her. However, according to the officer, there was no evidence of a break-in or any

13

marks on MURRAR indicating a struggle. Additionally, MURRAR refused to file a complaint for any charges. MURRAR also told the officer that MURRAR didn't want to get A.A. in trouble— MURRAR just said she didn't feel safe.

40.    I conducted a search of the aforementioned PDMP records and noted that MURRAR issued A.A. a total of four prescriptions for controlled substances, which were dispensed between October 2024 and February 2025. Three of the prescriptions were for Schedule II (stimulants) amphetamine-dextroamphetamine and one prescription was for Schedule 4 phentermine (typically used for weight loss).

41.    Failure to establish, maintain, or communicate professional boundaries is a violation of Wisconsin's administrative code (Wis. Admin. Code § N 7.03(4)(e)), as is engaging in sexual relationship with a patient (Wis. Admin. Code § N 7.03(4)(e)).

*Information obtained from Pharmacies*

42.    As part of my investigation, I also obtained copies of select prescriptions from three different pharmacies that were identified via the PDMP as being issued by MURRAR after MURRAR's Wisconsin state nursing licenses were suspended. These prescriptions were issued as paper prescriptions via a prescription pad for MURRAR containing the following pre-printed information: "Majidah Murrar, APNP; 9200 W. Wisconsin Avenue, Milwaukee, WI 53226; 414-758-7034."

43.    A prescription for a controlled substance may be issued only by an individual practitioner who is authorized to prescribe controlled substances by the jurisdiction in which he or she is licensed to practice his or her profession. 21 CFR §1306.03(a)(1). MURRAR' authority to issue controlled substances prescriptions in Wisconsin was suspended as of January 13, 2025. Also, a prescription for a controlled substance to be effective must be issued for a legitimate

14

medical purpose by an individual practitioner acting in the usual course of his or her professional practice. 21 CFR §1306.04(a). It is not in the usual course of professional practice to issue controlled substance prescriptions without State authority.

44. Prescriptions for controlled substances are also required to be issued in a certain manner. 21 C.F.R. §1306.05. For example, "All prescriptions for controlled substances shall be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner." 21 C.F.R. §1306.05(a). Additionally, investigation shows that, in one instance, the signature and DEA Registration Number for another practitioner, Chukwuma Edward UGWU, MD ("Dr. UGWU"), DEA Registration Number FU3813222, was utilized on a prescription dated January 31, 2025. That prescription also contained MURRAR's prescriber information ("Majidah Murrar, APNP; 9200 W. Wisconsin Avenue, Milwaukee, WI 53226; 414-758-7034"). Investigation shows that Dr. UGWU died of an opioid overdose on August 9, 2024. Dr. UGWU's death is currently under investigation with Wisconsin law enforcement. As indicated above, Dr. UGWU previously issued prescriptions to MURRAR (prior to his death).

45. It is a violation of 21 USC 843(a)(2) to use, in the course dispensing of a controlled substance, or to use for the purpose of acquiring or obtaining a controlled substance, a registration number which is issued to another person.

46. The aforementioned prescription dated January 31, 2025, was issued to E.Z. (DOB XX-XX-1994) for Adderall 30mg tablets, quantity 60. A review of PDMP records shows that MURRAR has issued controlled substance prescriptions for Adderall to E.Z. a total of 12 times (including this prescription) and that UGWU previously issued E.Z. a prescription on one instance

15

for a similar drug (amphetamine-dextroamphetamine 30mg tablets, quantity 30) in February 2024, six months prior to his (UGWU's) death.

47.     Based on my training and experience, and my review of PDMP and prescription records, there is probable cause to believe that MURRAR used or attempted to use the DEA registration number of another practitioner, now deceased, to issue controlled substance prescriptions in violation of 21 USC 843(a)(2).

***Controlled Substance Information***

48.     Schedule II controlled substances are those that have a "high potential for abuse" which "may lead to severe psychological or physical dependence," 21 U.S.C. §812(b)(2). Schedule II controlled substances are the most dangerous drugs that can be prescribed for medical use. See 21 U.S.C. §§812(a)(1)(B) and (C) (defining Schedule I controlled substances as having "no currently accepted medical use in treatment in the United States" and lacking "accepted safety…under medical supervision"); 21 U.S.C. §§812(b)(3)(A), (4)(A), and (5)(A) (defining controlled substances in Schedules III, IV and V as having lower potential for abuse than Schedule II controlled substances).

49.     Because Schedule II controlled substances have a high potential for abuse, Congress has enacted special statutes and regulations governing prescriptions for these drugs. For example, except in emergency situations, or when administered directly to a patient by a "practitioner," Schedule II controlled substances can be dispensed only with a "written prescription of a practitioner," 21 U.S.C. §829(a). In addition, "no prescription for a controlled substance in Schedule II may be refilled." For the distribution of a controlled substance to be authorized by law, it must be prescribed "for legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. §1306.04(a).

16

50.     Opioid medications, such as oxycodone and hydrocodone with acetaminophen, are Schedule II controlled substances. Because of the dangers associated with Opioids, the Centers for Disease Control (CDC) have issued guidance related to those classes of drugs. One such set of guidance documents refers to Morphine Milligram Equivalent (MME). MME measures an opioid dosage's equivalency to morphine. The CDC recommends that MME should not exceed 90 MME/day unless necessary with careful consideration and justification (www.cdc.gov).

51.     Hydrocodone with acetaminophen (brand name Vicodin, Lorcet, Norco, etc.) is a Schedule II controlled substance used to treat moderate to severe pain. It has a high risk for addiction and dependence. It can cause respiratory distress and death when taken in high doses or when combined with other substances.

52.     Oxycodone is also a Schedule II controlled substance used to treat moderate to severe pain. It has a high risk for addiction and dependence. It can cause respiratory distress and death when taken in high doses or when combined with other substances.

53.     Adderall is a Schedule II non-narcotic controlled substance, generic name amphetamine-dextroamphetamine. Adderall is a central nervous system stimulant that affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control and is used as part of a treatment program to control symptoms of attention deficit hyperactivity disorder (ADHD; more difficulty focusing, controlling actions, and remaining still or quiet than other people who are the same age). Adderall is used to treat ADHD in adults and children 3 years of age and older. Adderall may be habit-forming, and this medicine is a drug of abuse.

54.     Promethazine with codeine is a Schedule V controlled substance used to relieve cough, runny or stuffy nose, sneezing, or other symptoms caused by allergies or the common cold. It is an antitussive opioid combination liquid syrup. Promethazine works by blocking certain

17

histamine receptors in the body, which helps to reduce runny nose, sneezing, congestion, and other symptoms. Codeine reduces the urge to cough by affecting the part of the brain that controls the cough reflex. Promethazine with codeine may be habit forming and should only be used for short periods of time (www.fda.gov).

55.     Based on my training and experience, my review of the communications between MURRAR and M.B., my review of MURRAR's communications with DSPS, my review of telecommunications records showing MURRAR's use of the Device to communicate with pharmacies about prescriptions she issued after her license was suspended as well as showing communications on the Device with other individuals to whom she has issued prescriptions since suspension, including W.J.K., there is probable cause to believe that evidence of MURRAR's unlawful distribution of controlled substances may likely be stored and recorded on the Device belonging to and in the possession of MURRAR.

56.     Based on my training and experience, affiant is aware that individuals involved in the illegal distribution of controlled substances frequently use cellular telephones to maintain contact and arrange transactions with their sources and customers. Affiant has also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to unlawfully obtain or distribute controlled substances.

57.     Based on my training and experience, affiant believes it is common for crime suspects who possess and/or illegally distribute controlled substances to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal distribution of controlled substances. Furthermore, affiant believes it is common for these

18

photographs and visual depictions to be kept and maintained on their cellular and other electronic devices.

58.     Based upon the facts described above, to include (1) my knowledge of and experience confirming the prolific use of electronic devices to facilitate the possession and illegal distribution of controlled substances; and (2) M.B.'s statement to, and subsequently viewed by, the Mayville Police Department that messages regarding the illegal distribution of controlled substances were exchanged via text message and other messaging means; (3) MURRAR's use of the Device to communicate with W.J.K. while prescribing controlled substances after the suspension of her license; and (4) MURRAR's use of the Device to communicate with DSPS about her prescribing, there is probable cause to believe that a search of the information contained within the above described Device will produce evidence of a crime, namely evidence related to the unlawful distribution of controlled substances. I am requesting records dating back to July 1, 2023.

## TECHNICAL TERMS

59.     Based on my training and experience, I use the following technical terms to convey the following meanings:

       a.     Cellular telephone:  A cellular telephone is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system (GPS) technology for determining the location of the device.

19

b.      Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.      Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (GPS) consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards

20

or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system (GPS) technology for determining the location of the device.

f.     Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.     Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h.     IP Address: An Internet Protocol address (IP address) is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

60.     Based on my training, experience, and research, I know that the **Device** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player,

21

GPS navigation device, and PDA, and all have the ability to access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

61. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

62. As explained below, information stored within a cellular phone (cell phone) may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account was accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner. Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (e.g., location integrated into an image or video sent via email or text message to include both

22

metadata and the physical location displayed in an image or video).  Last, stored electronic data may provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation.  For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).  Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

63.    *Forensic evidence*.  As further described in Attachment B, this application seeks permission to search for evidence that might be found on the person of Majidah MURRAR in whatever form it may be found and to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Device** was used, the purpose of its use, who used it, and when.  Thus, the warrant for which I am applying would authorize the seizure of a cellphone or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).  I submit that if a cellphone is found on the person of MURRAR there is probable cause to believe that this forensic electronic evidence might be on the **Device** because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.    Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

23

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

64. *Necessity of seizing or copying entire electronic device.* In most cases, a thorough search of a target location for information that might be stored on electronic storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from a target location, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of data either from accidental or intentional destruction. This is true because of the following:

f. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for

24

forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

g.    Technical Requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

h.    Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

65.    *Manner of execution.*    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit seizing, imaging, or otherwise copying electronic storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is described by the warrant.

## BIOMETRIC UNLOCK

66.    The warrant I am applying for would permit law enforcement to obtain from Majidah MURRAR the display of physical biometric characteristics (such as fingerprint,

25

thumbprint, or facial characteristics) to unlock the device subject to search and seizure pursuant to this warrant. I seek the authority based on the following:

67.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

68.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

69.     If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

26

70.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

71.     As discussed in this affidavit, based on my training and experience, I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device, making the use of biometric features necessary to the execution of the search authorized by this warrant.

72.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

27

73. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of Majidah MURRAR to the fingerprint scanner of the device; (2) hold the device in front of the face of Majidah MURRAR and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

63. Based on the above information provided in this affidavit, I believe there is probable cause that the Device possessed by Majidah MURRAR contains evidence of violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute a Controlled Substance); 843(a)(2) (to use in the course of the manufacture, distribution, or dispensing of a controlled substance, or to use for the purpose of acquiring or obtaining a controlled substance, a registration number which is fictitious, revoked, suspended, expired, or issued to another person), and 843(a)(3) (to acquire possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge)(a. I respectfully request a search warrant to be authorized for the search of the person of Majidah MURRAR, described in Attachment A, to recover and seize evidence described in Attachment B, in any form, including her cellphone bearing phone number (414) 758-7034.

28

I swear under penalty of perjury that the foregoing is true and correct.

AMBER GIESE
Digitally signed by AMBER
GIESE
Date: 2025.04.01 18:13:46
-05'00'

_____
Amber Giese
Diversion Investigator, Drug Enforcement Administration


Sworn by the affiant in accordance with the requirements
of Fed. R. Crim. P. 4.1 by telephone on this __2__ day of April, 2025.

_____
STEPHEN C. DRIES
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF WISCONSIN

## ATTACHMENT A

### *Person and Property to be Searched*

1.      The person of Majidah MURRAR (A/F, DOB: 02/07/1991).

2.      MURRAR's cellphone bearing phone number (414) 758-0734.

## **ATTACHMENT B**

### *Particular Things to be Seized*

1.       The cellphone, including records and information stored on the **Device,** described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1), 843(a)(2) (to use in the course of the manufacture, distribution, or dispensing of a controlled substance, or to use for the purpose of acquiring or obtaining a controlled substance, a registration number which is fictitious, revoked, suspended, expired, or issued to another person), and 843(a)(3) (to acquire possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge) involving Majidah MURRAR since July 1, 2023, including:

   a.   Any audio, video, and/or photograph(s) files on the phone of the above criminal activity or of evidentiary value;

   b.   Records of communications, including voicemail, call records, call history, or text messages in any format regarding prescribing, providing, selling, distributing, or otherwise obtaining controlled substances;

   c.   Contact list, to include names, addresses, phone numbers, and/or email addresses;

   d.   All social media sites used and applications for social media sites;

   e.   All applications used to store patient care data, health records, or prescription records;

   f.   All applications used to manage, prescribe, issue, or track prescriptions of controlled substances;

   g.   Evidence of health, or patient, care provided by Majidah MURRAR;

   h.   Types, amounts, and prices of controlled substance transactions as well as dates, places, and amounts of specific transactions;

i. Any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

j. All bank records, checks, credit card bills, account information, and other financial records;

k. Evidence of compensation, gifts and/or favors exchanged between other individuals and Majidah MURRAR;

l. All internet activity; and

m. All location data including from the phone and/or from any downloaded applications.

2. Evidence of user attribution showing who used or owned the **Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history; and

3. Records evidencing the use of the Internet Protocol address to communicate with using the internet including:

a. records of Internet Protocol addresses used; and

b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data), any photographic form, and/or any memory card or other data storage device within or connected to the **Device**.

During the execution of the search described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of Majidah MURRAR to the

fingerprint scanner of the device; and/or (2) hold a device found in front of the face of Majidah MURRAR and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.